We'll continue with argument in our third case of the morning, Appeal No. 23-2851, Lirrah Hernandez v. City of Peoria. Good morning. Good morning. Good morning. My name is Kelly Olivier and I represent the appellant, Lirrah Hernandez, for the estate department officer, Brian Eisenhardt, on July 19, 2018. Eisenhardt and the City of Peoria's theory of this case is that Eisenhardt appropriately used deadly force when, in less than one second, Louis brandished a weapon, racked it, and pointed it at Eisenhardt's partner, Nicholas Mason. Appellant's theory is the opposite. Not only are those actions impossible to have accomplished in the less than one second, at the time that Louis was shot, he was turning to his left to comply with Eisenhardt's command to stop. Louis never brandished a weapon and he never threatened anyone, let alone Mason. Importantly, at summary judgment, the district court noted that there were substantial discrepancies between Eisenhardt's and Mason's versions of events and that the dash cam video of the incident contradicted both Eisenhardt's and Mason's testimony. To prove the case at trial, appellants sought to present evidence that would allow the jury to have a reasoned evaluation of the facts and to focus the jury's query on the only relevant inquiry. Did Eisenhardt use excessive force when he made the split-second decision to shoot Louis? Mr. Lilliard, I'm glad you started like this because one impression I took away from your briefs a little bit is that, you know, you present four alleged errors, right? But there's a flavor of the argument that seems like you're challenging the sufficiency of the verdict. But that's not before us, is it? No, it is not. And I would like to point out that we are specifically alleging a total of six evidentiary errors, but they do fall into two separate buckets. So the first bucket would be those four errors that you're referencing, which is the evidence that was improperly admitted. The second bucket would be the evidence that we're arguing was improperly excluded. And the cumulative effect of those errors essentially rendered the trial fundamentally unfair to appellant. I'd like to talk to you, please, about the bifurcation because the plaintiff refused bifurcation of the trial, of course, because she wished to present evidence about Mr. Cruz's character as a father and a brother to the jury. Under bifurcation, this evidence would have been available to the jury, of course, at the damages phase, but not at the liability phase. How do you think Cruz's character as a father and a brother is relevant to liability? And if it isn't, then why didn't the plaintiff not create any prejudice herself by refusing the district court's offer of bifurcation? I have been really puzzling over that. Ultimately, and the district court did note this in the motion for summary judgment and throughout the trial, this was a case that turned on the credibility of the witnesses, Eisenhardt, Mason, and the team members. And if there had been no testimony proffered on behalf of Louis Cruz, the jury would have certainly gotten zero flavor for Louis. I would also note that... But the plaintiff's counsel never explored what they would be able to say about Mr. Cruz because presumably the jury would need some background about Mr. Cruz. And what puzzled me along the lines of what Judge Roedner was saying is that there was no attempt by plaintiffs to even explore that option. You know, Judge, what can we say about Mr. Cruz? Can we say that he's a father? Can we say that he has a partner to provide at least some general background as to Mr.  And I'm surprised that there's nothing like that here. Well, I would note that with respect to the specific pieces of evidence that we're arguing should not have been included, it did go to Mr. Cruz's fatherhood, right? The trial court admitted into evidence that he was incarcerated at the time of his child's birth. But I guess my point is, I think if there was something in the record where the plaintiff's counsel said, Judge, you know, we would agree to bifurcate, but only if you allowed this type of testimony in a liability phase. And the parties explored that, and then the plaintiff said, okay, well, no, because we need this information even for liability, then that would be one matter. But I don't see any sort of discussion like that here. I would note that at the outset, plaintiff's appellants here today filed Motion in Limine No. 1, and that was a broad motion seeking to bar all of Louie's past criminal history, bad acts, and character evidence. So what we're talking about in this first bucket of evidence, which includes not just the bad evidence about his fatherhood and his criminal history, but also discusses the 49 messages, was all dealt with in one fell swoop. So we brought our Motion in Limine No. 1, seeking to bar all of that evidence as irrelevant, and at the very first pretrial conference, the district court made it clear the 49 messages were coming in, and thereafter, it was one thing after another. So the trial team at that point was making certain adaptations based upon the court's ruling. I would note that we attempted to revisit this issue with the trial court again and again. As you noted, he did offer bifurcation. But ultimately, knowing that the 49 messages were going to be coming in, this jury was going to be hearing this bad character, bad acts evidence. We wanted to be able—appellant wanted to be able to present and set forth the depiction of Louie, showing that he was a good father. And unfortunately, by showing that he was a good father, that's where all this impermissible other evidence came in. Can you, just in the limited time we have, one of the arguments that you make in your brief relates to—I think she's a member of the Illinois State Police Forensic Team. Yes. This is Jennifer McRitchie. Yes. Can you explain the testimony? I have a hard time, from the briefing, understanding what she would—how she was going to fit into your side of the case and what she was going to say or not say. Certainly. Jennifer McRitchie was an Illinois State Police forensic scientist who created a conversation record, which was a business record essentially, of a major case incident review that took place one week after the shooting at which she and others, including other laypersons, were present. In it, she noted what the Illinois State Police and the others present at this major case incident review were told about the underlying facts of the shooting. It's notable that at this major case incident review, her conversation record does not document that the offender turned and brandished a gun. It doesn't document that the offender racked a gun. It doesn't document that the offender pointed a gun. It does not even note that the shooting officer was defending his partner at the time. All it merely stated was that ISP was investigating that the offender turned and reached for something at his waist, and that the officer fired in self-defense, killing the offender, and that Appellant's position is that is yet another inconsistent and contradictory version of events from what Eisenhardt's testimony and the other officer's testimony was at trial. So would the idea have been that you called McRitchie to the stand and said, did you attend this meeting? What do you remember being said and not said? Correct. And wouldn't that be hearsay? Yes, but I think that we would, to the extent that she was present and this was information told to her, would also come in under impeachment by contradiction. Once again, we have, this is a situation where Louie was deceased. He did not have a voice in that courtroom. So this actually with McRitchie and also Shaquille Alexander's- Impeached her role in the investigation or impeached the broader local police department's investigation? Or I'm sorry, the Illinois State Police investigation. It would impeach the version of events that was being proffered by the city and by the commission members and by Eisenhardt and Mason at trial. Would I be wrong if I thought that the plaintiff offered no proof that McRitchie's conversation report was a reliable summary of all information that the police had, or even that she obtained the information from the police? In our proffer and in our motion for reconsideration, we did note that we had spoken with McRitchie and that she had indicated to us that a conversation record is something that she and her practice as a forensic scientist that attends these major case incident reviews on a regular basis, the conversation record is something that she creates contemporaneously with these major case incident reviews. It's important that it's accurate. It's important that it, to the extent that she's documenting what is told, the step, what she is told then dictates the crime lab's next steps in the Illinois State Police's  Well, I guess what I'm puzzled about is that, as Judge Scudder noted, I'm not clear who this testimony would be impeaching and how it would come in. And I think as a business record, you also need to establish that the people from whom she got the information had personal knowledge of the events. And here, I don't see anything that you've provided that would indicate that anyone that attended this meeting would have personal knowledge. So for example, Officer Eisenhardt wasn't there, and it's unclear whether anyone from the Peoria Police Department was there who would have spoken, I suppose, to the officers. And it just seems like it's so attenuated for impeachment evidence. Understood, but at the same time, I think that would be important for cross-examination to a certain extent, but nevertheless, you should No, no, no, but you're not, impeachment doesn't come in just to impeach a theory of the case. Impeachment comes in to impeach testimony, right? And so here, the only testimony that you'd be trying to impeach are the ones of the particular officers on the scene. And this impeachment evidence, if you want to call it that, just, I wonder if you can, is there a more direct link that you can make between the officers themselves and this conversation record? I think to the extent that at the major case incident review, in theory, they would have had access to the police reports of these officers, yet this conversation record still documents that they were investigating whether a gun was visible, not whether officers Right, but for, so for example, if someone had reviewed the police, all the police record and attended the meeting, right, someone from ISP, and then they just recollected it incorrectly, right, like, how wouldn't that, wouldn't that kind of undermine the impeachment value of the conversation record? And how would the defendants get into that? Respectfully, I would say that the conversation records, the extent that this major case incident review is so integral to the investigation and the testing that the Illinois State Police were going to be performing on the actual gun that was recovered at the scene. And with respect to all of the physical evidence, that, for this information to be inaccurate would be a huge issue. Well but also, Ms. McRitchie wasn't even the one responsible for securing the swabs, right, the samples. That was Mr. LeMasters, right? And so, you know, in your brief, you talk about how this meeting will set kind of the protocol for what testing will be done, but the decision whether or not to swab the area of the gun that might have been, touched the breech of the gun, that was already made by Mr. LeMasters after he was already told what the officers had told him, right? That decision had already been made, but McRitchie could have also made the decision that despite that swabbing not having occurred, it could still have occurred at that juncture. That's one of the reasons why the major case incident review is so important. It's kind of a check and balance off of the investigation that already took place at the scene. So to the extent if she had been informed that the gun had been racked, the gun was still in such a condition that she could have made that determination, you know what, this is a question that we still have to potentially explore, let's make that swab. So that's again why it's so disturbing that this information was incorrect within that conversation record. I would further note that as, again, as set forth in our brief, we sought forth to introduce McRitchie's testimony, but also the testimony of Shaquille Alexander. We did seek a pretrial ruling regarding Alexander's statement, and it is true that at that time we did not raise the Rule 803 exception, but I would point out that the court used this circuit's decision in United States versus Moore, where this circuit explicitly found that the Rule 807 exception is particularly apt where a statement bears the markers of reliability that are equivalent to those found in statements specifically covered by Rule 803 or 804, and as we set forth in our brief, Mr. Alexander's statement falls neatly within the Rule 803 exception, and the analysis is one and the same. It's because of the cumulative effect of the district court's rulings, both individually and as a whole, but the cumulative effect especially made it such that appellant was essentially fighting this trial with one hand tied behind her back, and we're seeking an opportunity for the judgment to be vacated and remanded so we could fight with both hands. Okay. Thank you. We'll give you a minute on rebuttal. Thank you. Mr. Sotos, good morning. Counsel, may it please the court, my name is Tom Sotos. I represent the defendant, Epeliz, in this matter, the city of Peoria, and Officer Ryan Eisenhardt will be asking the court to affirm the jury verdict in this case briefly to orient the court kind of where we're at, why we're here. In August of 2022, after more than three years of litigation, the district court denied Officer Eisenhardt's motion for summary judgment on the excessive force claim against him, deciding that a jury of his peers should decide the case. After three and a half days of testimony, over a five-day trial, the jurors retired from deliberations, they weighed the evidence, and after three hours and 20 minutes, they returned a verdict unanimously in favor of Officer Eisenhardt. And now we're here, and we're litigating a series of appellate issues born not out of the summary judgment ruling and frankly not particularly out of the verdict, but almost exclusively out of strategic choices or missteps that plaintiff's counsel made in the work of the evidence that was later admitted at trial. I would like to go directly to the issue of Ms. McRitchie, the focus of the court's question during counsel's argument was on that issue, to try to be as clear as possible. The major case review that is the focus of from where Ms. McRitchie's testimony would have come from. The only people to this date that we know for certain were at the major case review were Ms. McRitchie and Jerry Brady, who was the state's attorney at the Orea County at the time. There was an agreement between the parties not to introduce any evidence flowing from Jerry Brady's investigations into the trial. Parties agreed to that in a motion to eliminate file with the court that's mentioned in our brief. There has yet to be an explanation as to how any of the evidence Ms. McRitchie could have offered would have come in circumvention of that agreement, and that agreement was never offered to be withdrawn during the course of the trial proceedings. In addition, judges raised on multiple occasions some basic rules of evidence. We know in our brief that the initial ruling on Ms. McRitchie flowed from her disclosure late in the course of litigation as an expert. I would note that plaintiff never disclosed Ms. McRitchie as a witness, either as an expert or as a fact base. This despite defense counsel having disclosed Mr. Reneau and Mr. Johnson, who were essentially Ms. McRitchie's peers with the Illinois State Police. They were responsible for fingerprint analysis and weapons analysis. Ms. McRitchie did DNA analysis. Ms. McRitchie was never disclosed. Those two individuals were. I raise all that to note that they could have worked up a record had they desired to use Ms. McRitchie to demonstrate how her testimony would, as Judge Lee noted on numerous occasions, impeaches Officer Eisenhardt's testimony in any way, shape, or form. That record wasn't made, and in our brief, we note the trial court's eventual ruling when plaintiff moved to reconsider the exclusion on the grounds that she was disclosed late and her testimony was expert in nature. The court ultimately found that it wasn't impeaching testimony, which was the purpose that plaintiff's counsel identified Ms. McRitchie would be testifying to. That issue of impeachment, the ultimate ruling, which we raise in our response brief, that goes unresponded to in the reply. So, respectfully, the ultimate ruling on Ms. McRitchie is that she couldn't come in because they couldn't demonstrate how she would impeach Officer Eisenhardt. That issue hasn't been addressed in the papers. We would argue that it's waived since it's not addressed in the reply. Can I just rewind you for five seconds on the, I may have missed it, did you make this point about this eliminate ruling? We noted in the brief, we do not argue it extensively, it is noted in the response brief that Mr. Brady, I don't have the page, I can find it. That's all right, I can find it. I just don't remember reading it, but it's probably there. His name is Jerry Brady. Your Honor, it may well be in a footnote. This was not a major feature of the argument, but I want to ensure the court that it is in the brief and in the record, and I can do this with some quickness, there was a agreed motion to bar Jerry Brady evidence, that is docket number 67 on the record, where the parties filed the joint motion agreeing to bar the evidence from Mr. Brady. Again, he's the only other person that we know was at the major case review. A final point on the major case review, there are a number of representations in counsel's brief, and I would simply caution the court to be very wary of accepting certain representations where they aren't based on the evidence. There are a number of representations that the Peoria Police Department must have been at the major case review. There's nothing in the record to support that, and respectfully, it defies some common sense understandings of law enforcement and investigations. The major case review had Illinois State Police and the Peoria County State's Attorney reviewing the shooting. They were looking at the Peoria Police Department's actions. I don't believe it would make particular sense that the Peoria Police Department would be at this review, and there's no evidence in the record that they were. So any representation to that extent, it's not in the record. I want to ask you something factual, please. I was unable to get hold of the video, and the plaintiff maintains that the words, drop the gun, cannot be heard on the video. Is that correct? We would dispute that representation. We believe that it can be heard. The audio is, it requires some focus to listen, and that it's, I'm not sure why that isn't in the record. I probably weren't responsible for preparing the record here. It's 47-9. It was an attachment to the summary judgment briefing, and it was, it was offered at trial as an exhibit. I can't remember which exhibit it was, but that, that video of it, it should be made available. It was a feature presentation of the trial, so that would be my position. And I'd like to ask you about the drug charge. You know, a pending charge doesn't mean that an individual has been found guilty of a crime, or that they would serve any jail time related to that charge. Given that, what, what relevance did Cruz's pending drug charge have as to the question of damages? Absolutely, Judge. I think that this question is effectively resolved by this Court's decision in Cobage. This was a loss-of-society case vis-a-vis the issue of damages, so the question is, the jury's trying to adjudicate, quantify the loss-of-society experienced by Mr. Cruz's  That, that, that, that's the question. And part and parcel to that calculation is the fact that Mr. Cruz is no longer around. He was tragically killed in this event. However, and I appreciate the Court's note that a pending charge is not a conviction. However, it raises the possibility that Mr. Cruz would have been unavailable to his daughters because of a prison sentence that would have resulted from that charge. And in addition, Cobage teaches that when damages are part of the trial, and the plaintiff paints out the, in this case, the decedent, in somewhat saintly terms, there were, there was quite a bit of emotional testimony from his family about the kind of father that he was, the kind of person that he was. They are entitled to present that evidence in connection with damages. We not only are entitled to, but we are all but required to put on any evidence we have to rebut that notion. That's what Cobage teaches, where this Court actually reversed the exclusion of this sort of evidence. Respectfully, we think that if the trial court had gone the other way and had excluded this evidence at the trial level, in a hypothetical scenario, the verdict had gone against us, we would have had an extremely strong appeal for a new trial on damages, because this is the kind of evidence that Cobage teaches has to come in. And you say that against the backdrop of the way this proceeded and only the way it proceeded with the plaintiff refusing bifurcation. I apologize, I didn't hear the beginning of your question. That argument that you're making has to be taken against the backdrop of the way the case proceeded, where the plaintiff declined the invitation to bifurcate. Right. The analysis, I think, could be altogether different if the plaintiff said, yes, I want to bifurcate liability and damages, because I don't want that testimony coming in at the liability phase. It has nothing to do with this. I appreciate that, Judge, and I agree, however, the plaintiff didn't do that here. No, no, no. I know. I joined Judge Robner, and I have no idea why, but that's the way the case was litigated, and those decisions aren't our decisions to make. So the case comes to us on a record where the plaintiff declined an invitation to bifurcate the trial.  Yeah, no, I understand that, and Cobage was a joint trial on liability and damages, and I would simply note that where that is the circumstance, and particularly where it's the result of a choice the trial counsel makes, the defendants are entitled, virtually required, to address two separate legal regimes, if you will. One is liability, one is damages, and I understand that bad evidence on damages for either party is also bad, likely, on the issue of liability. We would submit it was the same for us, painting Mr. Cruz out to be a particularly, I keep using the word saintly. If there's a better word, I would defer to the court, but that was problematic for us. We think that's why plaintiff wanted to keep the trials together. That was their choice, but we had to face that same prejudice, but because the jury is required to adjudicate the issue of damages, the trial judge has a difficult task. He has to allow us to rebut their presentation of damages evidence, and that's all that happened here, and I think Cobage resolves this. Mr. Soto, both, I'm sorry, no, no, go ahead, Judge Wilk. The twins were removed from their mother's custody due to the actions of their mother, and subsequently, no evidence of abuse or neglect was found, but what relevance did the reason for the removal that one of the twins suffered a broken leg have to the question of damages, given that, I mean, Cruz was seemingly uninvolved with the incident? The critical portion of the DCF evidence was that the children were removed from Mr. Cruz's custody in the exact same month that Mr. Cruz was released from custody, and in particular, that the DCFS put requirements on both parents as a result of their investigation to take classes in order to see their children, and Mr. Cruz declined that request from the DCFS, and the mother of his children testified that she wished he had done that. So, the DCFS evidence, it needed to come in on the issue of damages so that we could demonstrate that, again, this goes to law society, how Mr. Cruz was going to be present in his daughter's lives. Mr. Soto, as I understand it, correct me if I'm wrong, the firms that are representing the respective sides on appeal were the ones that tried the case, right? Those are the firms, yes. Were there any, to your knowledge, were there any informal discussions between the attorneys of the different parties with regard to what a bifurcated trial would look like? Not to my knowledge, Judge. I was not directly involved in the work of the trial of this case. Certainly, that's not in the record. I will say that we are frequently surprised at the insistence with which parties opposite us on the V seek joint trials on damages and liability, and we are surprised in this case as we often are. I was just informed by head trial counsel that that issue was never discussed. Thank you. Yes. So, I know my time is starting to run short here. I would note, I know it hasn't been the focus of the court's discussion. I do have another factual question, which is really bothering me. I thought that all the parties agreed that the gun belonged to Cruz. Yes. But I just heard Ms. Olivier say the gun did not belong to Cruz. I, if that representation was made before the court, I apologize. I don't recall it. I don't want to accuse counsel of anything that I didn't hear directly. If that representation was made, it was incorrect. The parties did agree that the gun belonged to Mr. Cruz. That's certainly in the record. I expect counsel will confirm that. At trial? That was not contested? At trial? In opening statements, it was fronted by plaintiff's counsel that the gun belonged to Mr. Cruz. We'll ask Ms. Olivier.  Absolutely. Yeah. Just briefly on the two other, there's the damages evidence, there's the Ms. McGritchie evidence. There's also the issue of the 49 messages. I know that hasn't been the focus of the court's questioning. We think that this was a very careful exercise of discretion from the judge. We think Burton v. City of Zion controls rather conclusively on the issue of whether it's Rule 404 evidence. It's not Rule 404 evidence. It was offered for a suite of non-propensity purposes. And under Rule 403, the court has to engage in line drawing. Kept out the evidence about person of interest in a murder. Kept out the video evidence of Mr. Cruz smoking marijuana. Allowed in some very limited information about the 49 messages we would ask that the court find that was an appropriate exercise of discretion. As to Mr. Alexander, we think that the Rule 803-2 invocation on appeal has been waived. There's some dispute in the briefing about forfeiture and waiver. I'll admit there's some inconsistency in the court's usage of the vocabulary in its case law. Puffer v. Allstate calls it a waiver. Plaintiff counsel looks to some language and calls it forfeiture. That only matters for the court's application of plain error review, which in civil litigation is incredibly rare to be applied, and we don't believe it should be applied here in any event. With just a few seconds left, we would ask the court find that no discretion was abused at any point in this trial and that the court affirm the jury verdict in favor of Officer Eisenhardt and City of Peoria. Thank you. Mr. Sotos, thank you. Ms. Olivier, you have, I'll give you, yeah, you've got a minute left. To begin, Judge Roper, I would like to make clear that it was stipulated that the gun was Louie's and that he did have the gun that was recovered. Now, did you misspeak when you said it was not his, or did I miss hear? I may, I'll take it. I misspoke if I said that. I would note, with respect to the video, we can make sure that that gets into your judge's hands, that it was exhibit number one at the trial. You cannot hear, stop, show your hands. I would also note that that's the import, Mr. Alexander's testimony. During his excited utterance, he states that he heard the officer say, stop, show your hands. With respect to counsel's argument that Cobige is instructive, we would note it is not. In that case, it was a 27-year-old adult testifying to a lifelong adult relationship he had had with his mother was relevant for a jury to determine as the loss of society at the time of the twins, at the relationship at the time of Mr. Cruz's death. I would also note that this jury was poisoned by hearing this irrelevant propensity evidence, and that's conceded as much in Eisenhardt's brief. With respect, at page 33, with respect to the 49 messages, Apelli states that the 49 he was dealing with a potentially violent person, wanted for two violent crimes, who may well use force, that turned an objective standard into a subjective standard. I do see that my time is up, so thank you very much. Thanks to you, Mr. Sotos. Thanks to you and your colleagues as well. We'll take the appeal under advisement. I appreciate it very much.